1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

9  Holly M. Beck,

10                              Plaintiff,

11  v.

12  Carolyn W. Colvin, Acting Commissioner
    of Social Security,

13

14                              Defendant.

No. CV-13-01098-TUC-DCB (EJM)

**REPORT AND
RECOMMENDATION**

15
16
17

    Plaintiff Holly M. Beck ("Beck") brought this action pursuant to 42 U.S.C. §§

18  405(g) and 1383(c)(3), seeking judicial review of a final decision by the Commissioner of

    Social Security ("Commissioner"). Beck raises three issues on appeal: 1) whether the

19  Administrative Law Judge ("ALJ") erred in evaluating Beck's credibility, 2) whether the

20  ALJ's residual functional capacity ("RFC") assessment was erroneous, and 3) as a result

21  of these errors, whether the ALJ erred in her Step Four decision in concluding Beck could

22  perform her past relevant work.

23      Before the Court are Beck's Opening Brief, Defendant's Response and a Reply.

24  (Docs. 13, 16, 17). Based on the pleadings and the administrative record submitted to the

25  Court, the Magistrate Judge recommends that the District Court, after its independent

26  review, deny relief.

    **I.    Procedural History**

27      Beck filed an application for Supplemental Security Income ("SSI") and Disability

28

Insurance Benefits ("DIB") on October 2010. (Administrative Record ("AR") 147). Beck alleged disability beginning December 4, 2008 (AR 147) based on breast cancer, kidney problems, and total hysterectomy (AR 175). Beck's application was denied upon initial review (AR 103) and on reconsideration (AR 108). A hearing was held on May 31, 2012 (AR 56), after which ALJ Laura Speck Havens found, at Step Four, that Beck was not disabled because she was able to perform her past relevant work as a dispatcher (AR 30). The Appeals Council denied Beck's request to review the ALJ's decision. (AR 4).

## II.   Factual History

Beck was born on May 4, 1954, making her 54 at the alleged onset date of her disability. (AR 147). Beck has a high school education. (AR 59). She has worked a number of different jobs including casino dealer, cashier, waitress, office work, and limousine dispatcher. (AR 202-11). Beck's last job was with the Bellagio Hotel, from 2003 through 2010, where she worked as a cashier, waitress, and office clerk. (AR 202, 203, 207, 208). From 2001 to 2003, she worked as a cashier and stock person at Flamingo Chevron. (AR 202, 204, 207, 209). Beck indicated that she lifted up to fifty pounds at the Bellagio, and up to twenty pounds at Chevron. (AR 203-04, 208-09). In 1999 and 2000, Beck worked for another casino, AWI Keno, where she lifted up to fifty pounds. (AR 202, 205, 207, 210). Finally, Beck worked as dispatcher for On Demand Sedan in 1997 and 1998, and reported that she also lifted up to fifty pounds at this job. (AR 202, 206 207, 211).

### a.   Treating Physicians

At a mammography on December 18, 2008, a mass was found in Beck's left breast that was consistent with invasive carcinoma. (AR 408). Beck underwent a lumpectomy on February 19, 2009 with Dr. Theodore Potruch. (AR 247). There were no complications with the surgery and Beck was discharged the same day in satisfactory condition. *Id*. Follow-up appointments with Dr. Potruch occurred on February 24, March 18, April 15, May 13, June 10, July 15, and November 11, 2009, and January 20, July 21, and December 08, 2010.  (AR 393-400). Dr. Potruch observed some thickening below the

1    scar (AR 393-94), but otherwise noted Beck was doing well (AR 393), nicely (AR 396),
2    quite well (AR 397), fine (AR 399), and had recovered from all her surgeries (AR 395).

3              On February 24, 2009, Beck was seen for a radiation therapy consultation at the
4    Compassionate Cancer Center. (AR 345). She reported no fatigue, no joint or muscle
5    pain, and no pain. (AR 345-56). Beck was seen for radiation follow-up appointments on
6    March 10 (AR 348), April 14 (AR 350), July 14 (AR 352), and October 20, 2009 (AR
7    354). At each of these appointments, Beck had no complaints and reported no fatigue, no
8    joint or muscle pain, no pain, and no decrease in quality of life.

9              Beck was seen by Dr. Jogesh Harjai on April 28, 2009 for a complaint of vaginal
10   bleeding. (AR 257). She reported no dizziness, shortness of breath, back pain or nausea,
11   and Dr. Harjai noted full range of motion of all four extremities. (AR 257).  Dr. Harjai
12   opined that the bleeding was most likely due to Beck's uterine fibroids and recommended
13   she follow up with her GYN. (AR 258).

14             Beck was seen by Dr. Cord Strebel for gynecological appointments in 2009 and
15   2010. (AR 423-35). On an unknown date, Dr. Strebel documented pelvic pain and noted
16   Beck did not control her caloric intake or follow a balanced diet. (AR 428). At another
17   appointment, Dr. Strebel documented heavy bleeding and menorrhagia. (AR 434).

18             Beck was evaluated by Dr. Nicola Spirtos for a possible hysterectomy on May 11
19   and June 4, 2009. (AR 262, 295, 436). Dr. Spirtos reviewed Beck's subjective symptoms
20   and noted no fatigue, no dizziness, no gait abnormality, no shortness of breath, no chest
21   pain, no wheezing, no joint pain or leg cramps, no sleep disturbances, and no pelvic pain.
22   (AR 262, 295, 437). Dr. Spirtos recommended a TAH BSO (total abdominal
23   hysterectomy and bilateral salpingo-oophorectomy). (AR 263, 296). The procedure was
24   performed on June 23, 2009 and Beck was discharged four days later, and was noted to
25   be "recovering well." (AR 260).

26             Following her hysterectomy, Beck was seen for a wound infection on July 2, 2009.
27   (AR 294). Beck was seen for additional wound care appointments on July 3, 6, 8, 10, and
28   22, 2009 (AR 287-92). At a follow-up appointment on August 7, 2009, Dr. Brewer noted

1   the wound had healed. (AR 286). At another follow-up appointment on September 9,
2   2009, Dr. Brewer noted Beck's wound had completely healed and that she was healing
3   well. (AR 284). At the July 3, July 22 and September 9 appointments, Beck reported no
4   fatigue, no dizziness, no gait abnormality, no shortness of breath, no chest pain, no
5   wheezing, no nausea, and no joint pain, swelling, or stiffness. (AR 284, 287, 292).

6        Beck was seen for a urology consult by Dr. Victor Grigoriev on July 23, 2009.
7   (AR 313, 381). She reported no breathing problems, shortness of breath, arthritis, or other
8   pain. (AR 340). On August 12, 2009 Dr. Grigoriev noted a CT scan showed a renal mass
9   on her right kidney and recommended surgery. (AR 312). Beck underwent a right radical
10  nephrectomy (kidney removal) on September 1, 2009. (AR 298). She tolerated the
11  procedure well and had no nausea, vomiting, fever, chills, shortness of breath or chest
12  pain. (AR 298-99, 459-61). At follow-up appointments on January 20, 2010 (AR 310)
13  and July 21, 2010 (AR 309), Beck reported no new complaints.

14       Beck was seen for a post-lumpectomy mammography on January 20, 2010 (AR
15  365). Post-lumpectomy scarring was observed and no evidence of malignancy was found.
16  *Id*. Another mammography appointment on July 21, 2010 showed a mass-like scar that
17  was "felt to represent benign scar/fat necrosis." (AR 366).

18       Beck was seen at Compassionate Cancer Center on April 7, 2010. (AR 356). She
19  had no complaints related to the breast but reported "a bulge in her abdomen after she
20  eats." (AR 356). The doctor noted she would be "following up with a surgeon to evaluate
21  a possible recurrent hernia." (AR 356). At a follow-up on December 7, 2010, Beck had
22  no complaints related to the breast and reported she had an abdominal hernia found that
23  she planned to have repaired in the future. (AR 358). At the April 7 and December 7
24  appointments, Beck had no complaints of pain and reported no fatigue, no joint or muscle
25  pain, and no decrease in quality of life. (AR 356, 358).

26       Beck was seen for a cardiology consultation in June 2010. Beck reported she
27  becomes severely short of breath when walking her dog. (AR 369). Dr. Timothy Marshall
28  noted Beck had no chest pain and was negative for other cardiac systems, and that her

EKG was normal. (AR 369-70). Dr. Marshall scheduled an echocardiogram and an adenosine thallium scan. (AR 370). Following these tests, Dr. Marshall noted the echocardiogram showed normal left ventricular function with mild mitral regurgitation. (AR 368). He stated Beck's "exertional dyspnea does not appear to be related to obstructive coronary heart disease or structural heart disease." *Id*. Dr. Marshall recommended annual follow-up in the absence of new symptoms. *Id*.

Plaintiff was examined by Dr. Tracey Jeck in December 2010 for a full body skin check. (AR 470). Dr. Jeck recommended that Beck's skin tags were not skin cancer or precursors for skin cancer, and that removal of them would be for cosmetic reasons only. (AR 471).

Beck was seen by nurse practitioner Vickie Clous on June 14, August 13, and November 16, 2010 regarding constipation, hyperlipidemia (high cholesterol) and hypertension. At each of these appointments, Beck reported no new problems or concerns, and denied chest pain at rest, chest pain with exertion, shortness of breath, shortness of breath with exertion, dizziness, nausea, or fatigue. (AR 473, 476, 481, 492, 494). Beck also denied exercise intolerance and dyspnea (shortness of breath), and denied joint and muscle pain. (AR 473, 481, 492). At each appointment, Clous noted her exam showed "no stigmata of inflammatory or degenerative arthritis" and that Beck's gait was normal. (AR 477, 484, 495). Clous advised Beck to limit fat and sodium intake, lose weight, follow a low-fat and low-cholesterol diet, and exercise 30 minutes four days per week. (AR 479, 486, 497).

Beck was seen for a hearing evaluation on January 6, 2011. (AR 503). Beck reported "a gradual deterioration of the hearing in both ears over many years," and also said she had occasional dizziness that she treats with Meclizine. *Id*. Dr. Tilsner found Beck had "significantly asymmetric sensorineural hearing loss" and opined it was probably not caused by Meniere's disease because Beck's symptoms were not typical of Meniere's. *Id*. Dr. Tislner recommended a CT scan, which revealed some abnormalities in the left ear. (AR 504).

1    Beck was seen by Dr. Mindy Jan on February 2, February 22, March 31, August

2    17, September 8, and December 29, 2011 for chronic renal failure. (AR 591-96, 645). Dr.

3    Jan noted no dizziness, nausea, vomiting, or diarrhea. *Id*. Dr. Jan assessed ARF/CKD

4    (acute renal failure/chronic kidney disease). *Id*.

5    Beck was seen by nurse practitioner Vickie Clous on February 16, May 13 and

6    November 18, 2011 for hyperlipidemia and hypertension. On February 16 and November

7    18, Beck denied chest pain at rest, chest pain with exertion, shortness of breath, shortness

8    of breath with exertion, dizziness, nausea, or fatigue. (AR 640, 657). Beck also denied

9    exercise intolerance and dyspnea. (AR 640). On May 13, Beck complained of shortness

10   of breath with exertion and dyspnea, but denied chest pain at rest, chest pain with

11   exertion, shortness of breath, dizziness, nausea, or fatigue. (AR 674). At each

12   appointment, Clous noted her exam showed "no stigmata of inflammatory or

13   degenerative arthritis." (AR 643, 661, 678).

14   Beck was seen by Dr. David Engelsberg for a pulmonary consultation on June 15,

15   2011 with a chief complaint of exertional dyspnea. (AR 508). Beck reported the problem

16   had been going on for one year, and that "walking one block or doing house work will

17   make her short of breath." *Id*. On examination, Dr. Engelsberg reported that with

18   exertion, Beck's oxygen saturation level was 95%. (AR 509.) His impression was

19   "[d]yspnea of unknown etiology, probably most related to her weight, obesity, [and]

20   possible asthma." *Id*. Dr. Engelsberg recommended an x-ray, which revealed "no acute

21   cardiopulmonary process" (AR 510) and a Symbicort inhaler (AR 509). At a follow up

22   appointment on July 13, 2011, Dr. Engelsberg reported Beck was doing well and

23   breathing well and using the Symbicort. (AR 507). His impression was "[a]sthma,

24   stable." *Id*.

25   Beck was seen for an orthopedic consultation on June 16, 2011. (AR 547). She

26   reported significant hip and groin pain for four to six months, and also reported

27   significant problems rolling over in bed and walking. *Id*. Dr. Murray Robertson observed

28   Beck walked with a mild antalgic gait and had no difficulty on getting onto the exam

1    table, but had pain on log rolling of the hips, worse on the right, and that flexion and

2    rotation were particularly painful on the right hip. *Id*. Dr. Robertson reviewed x-rays and

3    assessed severe osteoarthritis of both hips and recommended Beck consider total hip

4    arthroplasty. *Id*.

5        Beck was seen for a hernia operation consultation on June 17, 2011 with Dr.

6    Shawn Stevenson. (AR 560). Beck also expressed interest in bariatric surgery, but told

7    Dr. Stevenson she was unwilling to alter her diet, which he noted would severely limit

8    the effectiveness of bariatric surgery. (AR 561). Dr. Stevenson also discussed with Beck

9    that her ongoing morbid obesity put her at significantly higher risk for recurrence of the

10   hernia. *Id*. Beck underwent laparoscopic repair of incarcerated incisional ventral hernia

11   on July 21, 2011. (AR 539). There were no complications and Beck tolerated the

12   procedure well. (AR 540). In a follow up note to Beck's nurse practitioner, Vickie Clous,

13   on August 8, 2011, Dr. Stevenson noted Beck had done relatively well since the

14   operation and had healed appropriately. (AR 558).

15       Beck was seen by nurse practitioner Vickie Clous on August 9, 2011 for nausea

16   and vomiting (AR 578) and was referred to the ER (AR 583). Beck was admitted to TMC

17   Hospital the same day with chief complaints of dizziness and difficulty breathing. (AR

18   528). She reported vomiting for two and half weeks following her hernia operation. *Id*.

19   On examination, heart rate, breath effort, and breath sounds were normal. (AR 531).

20   Laboratory studies indicated severe acute renal failure (AR 534) and it was noted that

21   "[b]reathing difficulty and her case most likely is from acidosis secondary to the

22   dehydration and acute renal failure" (AR 535). Dr. Mohammed Sikder diagnosed acute

23   renal failure due to ATN (acute tubular necrosis—a kidney disorder) and recommended

24   IV fluids. (AR 527). Dr. Sikder also diagnosed Type II diabetes and noted Beck did not

25   usually check her blood sugars. *Id*. Beck was discharged in stable condition on August

26   14, 2011. (AR 523).

27       Beck was seen by nurse practitioner Vickie Clous for a follow up on August 17,

28   2011. (AR 571). Beck denied chest pain at rest, chest pain with exertion, shortness of

breath, shortness of breath with exertion, dizziness, and nausea. *Id*. Beck complained of joint pain and swelling (AR 574), but Clous noted no stigmata of inflammatory or degenerative arthritis (AR 575). Clous advised Beck to limit fat and sodium intake, lose weight, follow a low-fat and low-cholesterol diet, and exercise 30 minutes four days per week. (AR 576-77).

Beck was seen again at TMC on August 21, 2011 with chief complaints of constipation, difficulty urinating and urinary frequency. (AR 516). She was negative for neck pain, shortness of breath, chest pain, and gait problem, and positive for abdominal pain and constipation. *Id*. On examination, the doctor noted no neck problems, normal heart rate and rhythm, normal breath, and normal range of musculoskeletal movement. (AR 519). It was recommended Beck follow-up with her surgeon and noted that Beck's complaints were very common following hernia operations. (AR 521).

Beck was admitted to TMC on December 8, 2011 with a complaint of severe pain in both hips. (AR 697). Dr. Robertson observed that Beck "walk[ed] into the office with a wide-based gait using a cane complaining about pain in both hips." *Id*.

Beck was seen by Vickie Clous on February 15, 2012 to follow up on her hypertension and hyperlipidemia. (AR 651). Beck denied chest pain at rest, chest pain with exertion, shortness of breath, shortness of breath with exertion, dizziness and nausea. (AR 651, 654). Clous advised Beck to limit fat and sodium intake, lose weight, follow a low-fat and low-cholesterol diet, and exercise 30 minutes four days per week. (AR 576-77).

b. **Additional Medical Information**

On April 26, 2012 Tucson Physical Therapy, PC completed a Functional Capacity Evaluation. (AR 706). Beck's current complaints were shortness of breath and bilateral leg pain. (AR 707). Some of the pain profile results were abnormal and indicated possible symptom magnification. *Id*. The results on all cardiovascular activities tested showed "questionable" effort by Beck, with the exception of the reach 2 min test, where Beck's effort was marked as "good." (AR 709, 710).  Testing for oxygen saturation showed

oxygen uptake of 99-100 percent for all activities tested. (AR 709). Beck was noted to have decreased lordosis (curvature of the spine), minimal rounded shoulders, minimal Dowager's hump, and limited stride length. (AR 710). The form also documents Beck's use of a single-point cane. *Id.* Beck had severe limitations for external and internal hip rotation of both legs. (AR 711). Minimal ulnar drift was noted in Beck's right hand. (AR 713). Static strength tests revealed some inconsistent results (AR 714), and Beck's effort on dynamic lifting tests was "questionable" (AR 715). Validity profile results indicated a submaximal and inconsistent effort (AR 717), and the therapist commented that Beck's effort level was questionable. (AR 718). The therapist also noted that Beck consistently reported she was limited by her reported shortness of breath. *Id.*

On April 30, 2012, MHC Freedom Park Health Center completed a Medical Source Statement. (AR 701). The form states Beck's diagnoses are hip pain and arthritic hips, that her prognosis is fair, and that her symptoms are daily pain and stiffness. *Id.* The forms states Beck's impairments have lasted or can be expected to last at least 12 months, and that she is not a malingerer. *Id.* Per Beck's responses, she can walk less than one block without pain, can sit for 30-45 minutes before needing a break, and can stand for 5-10 minutes before needing a break. (AR 702). Beck also indicated she could stand/walk less than 2 hours of an 8-hour work day and sit for 2-4 hours. *Id.* Beck further reported she needed a cane for standing/walking. (AR 703).

c. **State-Agency Consulting Physicians**

State-agency physician Dr. Mansour reviewed Beck's records and completed a Disability Determination Explanation form (initial) on March 23, 2011. (AR 81-87). Dr. Mansour found no evidence of an MDI (medically determinable impairment) severe enough to prevent SGA (substantial gainful activity). (AR 85). Disability examiner Alma Quesada further noted that there was "[n]o indication on medical records of hearing aid or need for cane." (AR 84).

State-agency physician Dr. Hirsch reviewed Beck's records and completed a Disability Determination Explanation form (reconsideration) on September 15, 2011.

(AR 89-101). The form notes that Beck reported she began experiencing new problems in January 2010, specifically shortness of breath and use of a cane. (AR 90, 94). Dr. Hirsch opined that Beck was only partially credible because the severity of her allegations was not entirely consistent with the available medical evidence. (AR 97). He further stated that the use of an AD (assistive device) did not appear to be supported. (AR 99).

Dr. Hirsch completed a Residual Functional Capacity Assessment, noting the following exertional limitations: occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, stand/walk for a total of 2 hours, sit for a total of 6 hours, occasionally climb ramps or stairs, never climb ropes or ladders, occasionally balance, kneel, and crouch, frequently stoop, and never crawl. (AR 98). Dr. Hirsch further recommended Beck avoid extreme heat and cold, fumes, and hazards. (AR 99). Dr. Hirsch opined Beck had the RFC to perform her past relevant work as dispatcher as generally performed in the national economy. (AR 100-101).

### d.  **Plaintiff's Testimony**

In response to an Exertional Daily Activities Questionnaire in December 2010, Beck reported that her average daily activities include getting dressed, walking her dog short distances, watching TV and visiting friends. (AR 186). She also reported shortness of breath when walking, constant pain in her left breast, and pain in both legs most of the time. (AR 186). Beck stated she used a cane for all walking and had been doing so for one year. (AR 188).

Beck completed another questionnaire in August 2011 and reported chronic pain in her hips, legs, groin, and left breast, and arthritis pain in her hands, back, and legs. (AR 198). Beck also reported dizziness, nausea, difficulty breathing, and chronic fatigue. (AR 198). She again stated she used a cane for walking. (AR 201).

In an undated Disability Report – Appeal, Beck reported that she sometimes needs help showering, that she has trouble picking things up off the floor, and that she walks with a cane. (AR 229-30).

Beck testified at her hearing before the ALJ on May 31, 2012 that she became

1    unable to work in December 2008 when she was diagnosed with breast cancer. (AR 59-

2    60). She was terminated from her last job in 2008 and filed for unemployment benefits,

3    and received unemployment for a year and a half. (AR 60-61). While she was receiving

4    unemployment she applied for other jobs such as waitress, secretary, and hostess. (AR

5    60). Beck reported that she wakes at 7:00 a.m. and is able to dress and bathe herself. (AR

6    61-62). She sometimes helps with chores, including mopping, sweeping, and washing the

7    dishes. (AR 62). Her husband does the cooking and she sends out her laundry. (AR 62).

8    Beck stated that she does not do the grocery shopping because she can't walk to the store.

9    (AR 62). She reported no hobbies but watches TV for five to eight hours per day. (AR

10   62-63).

11          Beck testified that she has problems sleeping and sleeps about five hours each

12   night. (AR 63). She takes two or three naps per day. (AR 69). She takes several

13   medications but has no side effects from them. (AR 64-65). Beck reported she can walk

14   and stand for 15 minutes at a time, but that sitting hurts because of her arthritis and hip

15   replacements. (AR 66). She can sit for 15 to 20 minutes and then has to lay down or

16   recline. (AR 66). Beck reported her knees, fingers, and elbows hurt from arthritis, that

17   she also has arthritis in her neck, and that her "hips bother me because they're not

18   completely healed." (AR 66). As to frequency of pain, Beck reported that she has a

19   stabbing pain in her hips that comes and goes, the pain in her neck and fingers is always

20   there, and the arthritis is a tingly sensation that goes away and comes back. (AR 67). On a

21   scale of one to ten, she rated her pain as a five or six with medication. (AR 67).

22          On examination by her attorney, Beck testified that she cannot walk without a

23   cane, and that she has been using it since 2008.[1] (AR 70). She uses the cane for balance,

24   because she gets tired from walking, and to help her stand erect. (AR 70).

25   _____

26          [1] The Court notes that while Beck testified she began using a cane in 2008, on the
     Disability Determination Explanation form (reconsideration) and Disability Report-
27   Appeal form, Beck reported that she began using a cane in January 2010. (AR 90, 190).
     On the Exertional Daily Activities form dated December 15, 2010, Beck reported she had
28   been using a cane for all walking for one year. (AR 188). The Court further notes that the
     record contains no allegations of hip pain until June 2011. (AR 547).

1          e.  **Vocational Evidence**

2          At the hearing before the ALJ, Judith Najarian testified as a vocational expert. She

3  stated that Beck's past work as a dispatcher was classified as sedentary work. (AR 75).

4  Beck's work as a casino writer, office staff clerk, and self-service gas station attendant

5  was semi-skilled, light work.  (AR 76). Beck's work as a cashier was classified as light

6  and unskilled, and her waitressing work was semi-skilled light to medium work. (AR 76).

7  Based on the hypothetical presented by the ALJ, Najarian testified that the only job a

8  person with Beck's restrictions could perform was dispatcher. (AR 77). Najarian opined

9  that a person with Beck's restrictions could not work competitively if she were to miss

10  three or more days of work per month. (AR 77-78).

11          f.  **ALJ's Findings**

12          The ALJ found that Beck had the following severe impairments: obesity, diabetes,

13  hypertension, Meniere's disease, osteoarthritis, and asthma. (AR 25). The ALJ found that

14  Beck's testimony regarding the severity and functional consequences of her symptoms

15  was not fully credible in light of the medical records, findings on examination, and

16  treating source reports. (AR 28-29).

17          The ALJ gave reduced weight to the Medical Source Statement (AR 701)

18  completed by MHC Freedom Park Health Center because the signature on the form was

19  illegible and Beck testified that the form was not completed by her regular physician.

20  (AR 29). In addition, the ALJ noted that "the functional limitations are qualified

21  throughout the form responses with 'per patient response.' This indicates that the

22  provider completed the form based on the claimant's subjective self-report rather than

23  objective evidence." *Id.*

24          The ALJ gave substantial weight "to the findings of the State agency medical

25  consultants," which "found the claimant capable of a wide range of sedentary level

26  work."(AR 29). The ALJ further found that "[i]n reviewing the evidence available at the

27  hearing level, this assessment is consistent with the overall evidence." *Id.*

28          The ALJ concluded that Beck could perform sedentary work that required

1   occasionally lifting and carrying 10 pounds and frequently lifting and carrying less than

2   10 pounds. (AR 27). At Step Four[2] of the SSI/DIB evaluation process, the ALJ found

3   Beck was able to perform her past relevant work as a dispatcher both as actually

4   performed and as generally performed. (AR 29-30). The ALJ therefore concluded Beck

5   was not disabled. (AR 30).

6                    g.   **Additional Evidence Submitted to Appeal's Council**

7            After the ALJ's June 21, 2012 decision, Beck submitted additional evidence to the

8   Appeals Council. (AR 719). This evidence consists of medical records from the

9   University of Arizona Medical Center. On June 7, 2012, Beck was seen for a chief

10  complaint of shortness of breath. (AR 745). She reported the problem had been occurring

11  for two years, and that she "can hardly walk for 100-200 yards." *Id*. The doctor referred

12  Beck for a spirometry (test measuring lung function) and sleep study, and opined "[a]t

13  this time we would not recommend any treatment." (AR 746). On June 21, 2012, Beck

14  underwent pulmonary testing. (AR 723-36). Post-test comments noted that Beck exerted

15  maximal effort and that "since performance on spirometry was so good, bronchdilators

16  were not given." (AR 730). Other comments noted "no obstruction, no restriction, mild

17  decrease in diffusion, respiratory alkalosis, and normal oxygenation." *Id*. No additional

18  evidence was submitted on Beck's ability to walk, her hip pain, or her use of a cane.

19           The Appeals Council found that the additional evidence did not provide a basis for

20  changing the ALJ's decision. (AR 4).

21  **III.    Standard of Review**

22           The Commissioner employs a five-step sequential process to evaluate SSI and

23  DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S.

24  458, 460-462 (1983). To establish disability the claimant bears the burden of showing she

25  (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment

26  meets or equals the requirements of a listed impairment; and (4) claimant's residual

27  _____

28           [2] At Step Four, the Commissioner determines whether the claimant has sufficient
    residual functional capacity to perform past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).

functional capacity ("RFC") precludes her from performing her past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

In this case, Beck was denied at Step Four of the evaluation process. Step four requires a determination of whether the claimant has sufficient RFC to perform past work.  20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. If the ALJ concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R. §§ 404.1520(f), 416.920(f). An RFC finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms. Social Security Ruling (SSR) 96-8p.

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 690 (9th Cir.2009) (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that

1   supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d

2   at 1035 (internal quotation marks and citations omitted).

3        The ALJ is responsible for resolving conflicts in testimony, determining

4   credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

5   1995). "When the evidence before the ALJ is subject to more than one rational

6   interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc.*

7   *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not

8   the reviewing court must resolve conflicts in evidence, and if the evidence can support

9   either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v.*

10  *Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

11       Additionally, "[a] decision of the ALJ will not be reversed for errors that are

12  harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the

13  burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir.

14  2011) (citing *Shinseki v. Sanders*, 556 U.S. 396, 129 S.Ct. 1696, 1706 (2009)). An error

15  is harmless where it is "inconsequential to the ultimate nondisability determination."

16  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see*

17  *also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each

18  case [the court] look[s] at the record as a whole to determine whether the error alters the

19  outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so

20  long as there remains substantial evidence supporting the ALJ's decision and the error

21  does not negate the validity of the ALJ's ultimate conclusion. *Id.* (internal quotation

22  marks and citations omitted).

23       Finally, "[a] claimant is not entitled to benefits under the statute unless the

24  claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss*

25  *v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).).

26    **IV.**    **Analysis**

27       Beck argues the ALJ erred in assessing her credibility, determining her RFC, and

28  in conducting the Step Four analysis. (Doc. 13). Beck asks the Court to reverse the

1    Commissioner's final decision and remand this matter for rehearing. (Doc. 13 at 18-19).

2    The Commissioner contends that the ALJ's decision is supported by substantial evidence

3    and that the record as a whole does not support a finding of total disability. (Doc. 16).

4    The Court concludes that the ALJ's decision is supported by substantial legal evidence

5    and is free from legal error.

6                    a.  *Credibility finding*

7           The ALJ found that Beck's statements regarding the severity and functional

8    consequences of her symptoms were not fully credible in light of the medical records,

9    findings on examination, and consulting physician reports. (AR 28-29). Beck argues that

10   the ALJ failed to support this credibility finding with clear and convincing reasons, that

11   the ALJ erroneously required objective evidence of Beck's daily activities, and that the

12   ALJ erroneously evaluated Beck's hip pain.  (Doc. 13 at 15-17).

13          While questions of credibility are functions solely for the ALJ, this Court "cannot

14   affirm such a determination unless it is supported by specific findings and reasoning."

15   *Robbins v. Comm'r Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006). "To determine

16   whether a claimant's testimony regarding subjective pain or symptoms is credible, an

17   ALJ must engage in a two-step analysis." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1035-36

18   (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented

19   objective medical evidence of an underlying impairment 'which could reasonably be

20   expected to produce the pain or other symptoms alleged.'" *Id*. at 1036 (quoting *Bunnell v.*

21   *Sulivan*, 947 F. 2d 341, 344 (9th Cir. 1991)). "Second, if the claimant meets this first test

22   and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony

23   about the severity of the symptoms only by offering specific, clear and convincing

24   reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen v. Chater*, 80 F.3d

25   1273, 1282 (9th Cir. 1996)).

26          While it is permissible for an ALJ to look to the objective medical evidence as one

27   factor in determining credibility, the ALJ's adverse credibility finding must be supported

28   by other permissible evidence in the record. *Bunnell v. Sullivan*, 947 F.2d 341, 346-47

(9th Cir. 1991) ("adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence"). However, "an ALJ may reject a claimant's statements about the severity of his symptoms and how they affect him if those statements are *inconsistent with or contradicted* by the objective medical evidence." *Robbins*, 466 F.3d at 887 (emphasis in original). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotation marks and citations omitted).

The ALJ did not make a finding that Beck was malingering; therefore, to support her discounting of Beck's assertions regarding the severity of her symptoms, the ALJ had to provide clear and convincing, specific reasons.

The ALJ's finding that Beck was not entirely credible regarding her limitations was based on the medical record that reveals the treatment Beck received has been generally successful in treating her conditions and controlling her symptoms. First, the ALJ noted Beck was treated for breast cancer in 2009, that pathology for metastasis was negative, and that although Beck "reported ongoing left breast pain, there is no objective evidence that such complaints were addressed by her treating physicians." (AR 28). Second, the ALJ noted Beck "is status post hysterectomy and ventral hernia repair. There is no evidence of any residual functional limitations as a result of these surgeries, which were successfully performed, with no ongoing complaints." *Id*. Third, the ALJ noted Beck's 2010 cardiac evaluation indicated her shortness of breath was possibly related to obesity, but that Beck "chose not to pursue any medical course to lose weight." *Id*.; *see Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (ALJ may properly rely on an unexplained or inadequately explained failure to follow a prescribed course of treatment).

1    Fourth, the ALJ noted that Beck's hip pain had been addressed with surgery,[3] and

2    although Beck uses a cane, "there is no evidence that this is medically required or was

3    prescribed by a physician." (AR 29). Fifth, the ALJ noted "[t]here is very limited

4    objective evidence to support the claimant's allegations of constant arthritic pain and

5    limited daily activities." *Id*. Finally, the ALJ noted the physical therapist questioned

6    Beck's level of effort and reported shortness of breath, and some of the test results were

7    invalid. *Id.*; *see Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (where claimant

8    failed to give maximum or consistent effort during two physical capacity evaluations,

9    "[her] efforts to impede accurate testing of her limitations supports the ALJ's

10    determinations as to her lack of credibility.").

11        The ALJ also pointed to Beck's testimony that she believed she was able to work

12    during the period she was receiving unemployment and applying for jobs:

13            The claimant testified that after she stopped working in
         December 2008, the month she alleges she became disabled,
14         she received unemployment benefits for the next year and a
         half. This indicates the claimant was willing, available, and
15         more importantly, able to accept any offer of employment
         during the period she received those benefits. The claimant
16         testified that she believed she was able to work while she was
         applying for various jobs.
17

18    (AR 29); s*ee Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988) (upholding adverse

19    credibility finding where ALJ noted that, because claimant received unemployment

20    insurance after he was laid off, he "apparently consider[ed] himself capable of working

21    and [held] himself out as available for work").[4]

22        For all of these reasons, the ALJ found that there was "very limited objective

23    evidence to support [Beck's] allegations of constant arthritic pain and limited daily

24    ———————————

25        [3] Beck testified that her right hip was replaced in December 2011 and her left hip
    was replaced in January or February 2012. (AR 66).

26        [4] The Court also notes Beck's inconsistency on this issue. For example, on the
27    Disability Report form, Beck reported that she stopped working in December 2008
    because of her condition (AR 175), when in fact she was terminated. (AR 60). In
28    addition, Beck's testimony suggests that while she was actively applying for jobs while
    receiving unemployment, at some point she simply got tired of submitting applications
    and being rejected. (AR 72).

1  activities." (AR 29). In making this credibility finding, the ALJ drew primarily on the

2  lack of medical evidence supporting Beck's alleged symptoms, but also noted Beck's

3  ability to complete activities of daily living (AR 28),[5] and the fact that Beck believed she

4  was capable of working when she received unemployment (AR 29). These were specific,

5  clear, and convincing reasons, and the ALJ did not err by finding Beck's allegations of

6  subjectively disabling symptoms were not credible.[6]

7      Contrary to Beck's contention, the ALJ did not require objective evidence of

8  Beck's daily activities. Rather, after reviewing the medical record, the ALJ considered

9  Beck's testimony on her symptoms and daily activities, but found Beck was not fully

10  credible in light of the fact that Beck's statements were inconsistent with the objective

11  medical evidence. *See Robbins*, 466 F.3d at 887.

12      Beck further contends that the ALJ erroneously evaluated her hip pain. Although

13  the ALJ noted Beck's "[b]ilateral hip pain has been addressed with surgery" (AR 29),

14  Beck testified that sitting hurts because of her arthritis and hip replacements, and that her

15  "hips bother me because they're not completely healed." (AR 66). Beck alleges disability

16  beginning in December 2008, yet there is no mention of hip problems in the medical

17  record until June 2011.[7] (AR 547). While Beck may have had hip pain at the time of the

18  _____

19  [5] The ALJ noted that Beck handles her personal care and does some chores, but does not cook, go shopping or exercise. (AR 28).

20  [6] The ALJ's finding on this issue are consistent with the medical record, which

21  shows that while Beck no doubt experienced a number of medical issues, her major

22  surgeries were all performed successfully and she recovered well, with no ongoing issues or problems related to her breast cancer, hysterectomy, kidney removal, or hernia repair. In addition, Beck's reported shortness of breath was found to be not related to heart

23  disease (AR 368-70), her oxygen saturation level was 95% (AR 509), and her symptoms improved with use of an inhaler (AR 507). Finally, Beck's allegations of constant

24  arthritic pain are not supported by the record, which shows that at almost all of Beck's medical appointments from 2009 through 2012, she reported no pain, and no joint or

25  muscle pain, and nurse practitioner Vickie Clous consistently noted no stigmata of inflammatory or degenerative arthritis. Despite Beck testifying that she has arthritis in her

26  knees, fingers, elbows, and neck (AR 66), the medical record is absolutely devoid of any mention of these ailments.

27  [7] The Court notes that this allegation of hip pain seems to be an eleventh hour attempt to bolster Beck's claim for DIB. Beck alleges disability dating back to 2008, and

28  saw numerous medical providers during 2009 and 2010, yet she never reported any pain or other issues with her hips until June 2011. At the June 16, 2011 appointment, Beck

- 19 -

hearing due to her recent surgery, Beck submitted no medical documentation of her hip surgeries, follow-up appointments, or any other medical records documenting ongoing hip pain. It is the claimant's burden to provide objective evidence to support her allegations of disability, and in this case, it was not unreasonable for the ALJ to find Beck's allegation of hip pain not fully credible where the medical evidence submitted on this issue is almost nonexistent. *See* 20 C.F.R. § 404.1512(a); *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001).

By citing to the medical evidence that shows Beck's medical issues have largely been resolved or are controlled, Beck's daily activities, and Beck's statements regarding her belief that she was able to work, the ALJ provided the requisite specific findings for discounting Beck's testimony concerning the severity of her symptoms. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009). Though Beck's testimony may be susceptible to more than one interpretation, the ALJ's credibility finding is "a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

b. *RFC and Cane*

Beck alleges the RFC assessment is flawed because the ALJ did not take into account Beck's use of a cane.

Residual functional capacity is "the most [a claimant] can still do despite [her] limitations," and includes assessment of the claimant's "impairment(s), and any related symptoms, such as pain, [which] may cause physical and mental limitations that affect what [she] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). In determining the RFC, if the ALJ finds a claimant cannot do her past work, the ALJ may still find that a claimant can adjust to other work if she can do any jobs that "exist in significant numbers

---

reported "significant hip and groin pain for approximately 4-6 months" (AR 547), yet there is no documentation of Beck reporting hip pain to any of her providers prior to this appointment. The Court further notes that while there is insufficient evidence to substantiate Beck's allegations of disabling hip pain and that Beck's alleged hip problems do not support a disability onset date of December 2008, Beck could re-file a new DIB application based on the onset date of her alleged hip issues.

1   in the national economy." 20 C.F.R. § 404.1560(c)(1).

2       The Commissioner retains the ultimate responsibility for assessing a claimant's

3   RFC. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The ALJ was required to assess Beck's

4   RFC based on all the record evidence, including medical sources, examinations, and

5   information provided by Beck. 20 C.F.R. §§ 404.1545(a)(1)-(3), 416.945(a)(1)-(3).

6   However, the ALJ need not include all possible limitations in her assessment of what a

7   claimant can do, but rather is only required to ensure that the residual functional capacity

8   "contain[s] all the limitations that the ALJ found credible and supported by the

9   substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir.

10  2005); *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) ("The ALJ, though, 'is free

11  to accept or reject restrictions in a hypothetical question that are not supported by

12  substantial evidence.'" (quoting *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir.

13  2001)).

14      Beck contends "[t]he ALJ unreasonably found that Beck did not need a cane, in

15  part, because Beck used a non-prescribed cane." (Doc. 13 at 11). The ALJ did not include

16  a cane in the RFC assessment (AR 27) and noted that there was "no evidence that [Beck's

17  use of the cane] is medically required or was prescribed by a physician" (AR 29). This

18  assessment is consistent with the medical records, which are devoid of any

19  recommendation that Beck should use a cane. Beck saw nurse practitioner Vickie Clous

20  for a number of appointments from 2009 through 2012, but there is no documented use of

21  a cane on any of these dates, and Clous consistently reported no gait abnormality.[8] In

22  fact, there are only 3 instances where Beck's use of a cane is mentioned, and in each of

23  these cases, the medical provider was noting an observation, not making a

24  recommendation. First, at an appointment on December 8, 2011 Dr. Robertson observed

25  _____

26      [8] The Court notes Beck attended numerous medical appointments with multiple
    providers between 2008-2012, yet none of the providers recommended or prescribed a
    cane for Beck. Rather, other providers in addition to Clous also reported Beck had no

27  joint swelling, pain, or stiffness, no muscle pain, and no leg cramps. (See e.g. AR 262,
    284, 356, 358). Further, had Beck been using a cane since 2008 as she alleges (AR 70),

28  the Court presumes that at least one of Beck's medical providers would have noted her
    use of the cane prior to the December 2011 appointment with Dr. Robertson.

that Beck "walk[ed] into the office with a wide-based gait using a cane complaining about pain in both hips." (AR 697). Second, the Functional Capacity Evaluation from April 26, 2012 documents Beck's use of a single-point cane. (AR 710). Finally, the Medical Source Statement from April 30, 2012 notes that Beck reported she needed a cane for standing/walking. (AR 703).

Beck focuses on the fact that while each of these providers documented her use of the cane, they did not specifically state that the cane was not medically necessary. (Doc. 13 at 11-12). However, the inverse is also true—none of the providers specifically stated that the use of the cane *was* medically necessary. Beck further alleges that the ALJ failed to consider or properly credit these providers' observations. (Doc. 13 at 12). The ALJ did not make a specific finding as to the weight that should be given to Dr. Robertson's observation or to the Functional Capacity Evaluation. The ALJ did state that the Medical Source Statement would be given reduced weight because the signature on the form was illegible and Beck testified that the form was not completed by her regular physician. (AR 29). In addition, the ALJ noted that "the functional limitations are qualified throughout the form responses with 'per patient response.' This indicates that the provider completed the form based on the claimant's subjective self-report rather than objective evidence." *Id*.  There is no evidence that the ALJ failed to evaluate or consider each of the three observations noting Beck's use of a cane.

While Beck correctly points out that a purchasing and using a cane does not require a prescription (Doc. 13 at 11), a claimant's choice to use a cane does not automatically entitle the claimant to an RFC finding that incorporates the use of a cane. In fact, Beck's opening brief cites SSR 96-9p, which states: "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." Here, there is no such documentation.

The case of *Thomas v. Barnhart*, 278 F.3d 947 (2002) is on point. In *Thomas*, the Court found that where the ALJ "determined that Mrs. Thomas' subjective complaints of

1    pain were not credible … the ALJ need not have included Ms. Thomas' use of a cane or
2    wheelchair in his hypothetical." *Id*. at 959. The court further noted that "[w]hile the
3    record contains conclusory statements that Ms. Thomas needed a cane … [w]ithout
4    objective medical evidence that Ms. Thomas needed a cane or wheelchair, and in light of
5    the ALJ's findings with respect to Ms. Thomas' lack of credibility, there was no reason to
6    include Ms. Thomas' subjective use of those devices in the hypothetical to the VE." *Id*. at
7    959-60. Finally, the court stated that because "the ALJ's hypothetical incorporated the
8    option of sitting while working … Ms. Thomas' alleged use of a cane or wheelchair
9    would be irrelevant." *Id*. at 960.

10        In Beck's case, as in *Thomas*, there is no objective medical evidence that Beck
11   needs a cane. Further, the ALJ found Beck to be only partially credible because the
12   objective medical evidence did not fully support Beck's statements regarding the extent
13   and severity of her pain and limitations, thus the ALJ was not required to include Beck's
14   subjective use of a cane in the RFC or hypothetical to the VE. Finally, the ALJ's RFC
15   assessment and hypothetical included options for Beck to sit, stand, and walk during the
16   work day, with the majority of time (6 out of 8 hours) spent sitting.

17        Beck also suggests that she uses a cane due to her Meniere's disease, which can
18   cause vertigo. (Doc. 13 at 13-14). Although Beck testified that gets dizzy from the
19   Meniere's disease and takes medication for her dizziness, she did not testify that she uses
20   the cane for dizziness. (AR 65, 69). Further, Beck consistently reported no dizziness to
21   her medical providers from 2009 through 2012, with the exception of two appointments.
22   On August 9, 2011 Beck was admitted to TMC Hospital with chief complaints of
23   dizziness and difficulty breathing, which was found to be related to acute renal failure.
24   (AR 528, 534-35). At Beck's hearing evaluation on January 6, 2011, she reported
25   occasional dizziness that she treats with Meclizine. (AR 503).There is no indication from
26   the medical records or from Beck's own testimony that her use of the cane is related to
27   dizziness associated with Meniere's disease.

28        If the Court does not agree that Beck's use of the cane is medically necessary,

1   Beck alternatively argues that the ALJ should have developed the record further to
2   determine whether it was necessary or not. (Doc. 13 at 14). Beck cites C.F.R. §
3   404.1519a(b) (2014),[9] which states "[w]e may purchase a consultative examination to try
4   to resolve an inconsistency in the evidence, or when the evidence as a whole is
5   insufficient to allow us to make a determination or decision on your claim." However, an
6   ALJ is only required to further develop a record if the evidence is consistent but the ALJ
7   does not have sufficient evidence to determine whether a claimant is disabled, or if after
8   weighing the evidence, the ALJ still cannot reach a conclusion as to disability. 20 C.F.R.
9   § 404.1520b (2014); *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) ("an ALJ's
10  duty to develop the record further is triggered only when there is ambiguous evidence or
11  when the record is inadequate to allow for proper evaluation of the evidence") (citation
12  and internal quotation marks omitted). The ALJ did not make a finding that the evidence
13  was inadequate or inconsistent to make a finding regarding Beck's use of a cane. Instead,
14  the ALJ reasoned that based on all of the objective medical evidence, there was "no
15  evidence that [Beck's use of the cane] is medically required." (AR 29).

16       Beck further alleges the ALJ "did not obtain a medical opinion from an acceptable
17  medical source." (Doc. 13 at 15). Here, state agency physician Dr. Hirsch examined the
18  medical evidence and opined that Beck's use of a cane was not supported by the record.
19  (AR 99). Beck was seen for numerous medical appointments from 2009 through 2012,
20  yet the record is devoid of any recommendation that Beck should use a cane, and there
21  are only three instances during this time period where Beck's providers observed her
22  using a cane.

23       In sum, the ALJ was only required to ensure that the RFC "contained all of the
24  limitations that the ALJ found credible and supported by the substantial evidence in the
25  record." *Bayliss*, 427 F.3d at 1217; *Greger*, 464 F.3d at 973. The ALJ was not required to
26  include limitations requiring use of a cane, because although Beck testified that she used

27  _____

28       [9] Beck cites the 2013 version of the statute in her opening brief. The Court cites the more recent 2014 version here.

- 24 -

a cane and had trouble walking long distances without one,[10] there was no medical evidence to support these claims, nor did any of the medical providers specifically recommend an assistive device. Based on this finding, as well as her finding that Beck's testimony regarding her limitations was only partially credible, the ALJ chose not to include a cane in her RFC assessment. The Court finds that the ALJ's assessment of Beck's RFC was based on all the limitations the ALJ found credible and supported by substantial evidence, and the Court finds no error here. *See Aukland*, 257 F.3d at 1035.

> c.  *Step Four: Past Relevant Work*

Beck contends the ALJ erred in concluding Beck could perform her past relevant work as a dispatcher because the ALJ found Beck could lift and carry up to 10 pounds, but Beck reported she lifted up to 50 pounds when she worked as a dispatcher. (Doc. 13 at 8).

In determining the physical requirements of a claimant's past work, and whether she has the RFC to perform it, the ALJ considers the information provided by a claimant, as well as others who are familiar with her work, vocational experts and the DOT. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).

Here, the ALJ determined Beck could perform her past relevant work as a dispatcher both as actually performed and as generally performed in the national economy. (AR 30). The ALJ based this decision on testimony from the VE, who testified that a person of Beck's age, education, past relevant work, and RFC could do Beck's past relevant work as a dispatcher (AR 76-77). Under the Dictionary of Occupational Titles (DOT), work as a dispatcher is classified as sedentary. Dep't of Labor, DOT, No. 249.167-014 (9th ed. 1991), 1991 WL 672312. "The RFC to meet the physical and

---

[10] The Court also notes the ALJ's credibility assessment on this issue is further supported by the numerous inconsistencies in Beck's reports as to when she first began using a cane. For example, at the hearing before the ALJ, Beck testified that she has been using a cane since 2008 (AR 70), yet on the Disability Determination Explanation Form (reconsideration) and Disability Report-Appeal form, Beck reported that she began using a cane in January 2010 (AR 90, 190). On the Exertional Daily Activities form dated December 15, 2010, Beck reported she had been using a cane for all walking for one year. (AR 188).

mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy) is generally a sufficient basis for a finding of 'not disabled.'" SSR 82-62 at *3.

The Commissioner argues that because the ALJ found Beck was not fully credible, the ALJ did not have to credit Beck's allegation that she lifted up to 50 pounds in her past work as a dispatcher. (Doc. 16 at 18). The ALJ's decision does not include a specific finding as to Beck's credibility regarding her past relevant work. Regardless, even if Beck did lift up to 50 pounds when she previously worked as a dispatcher, the ALJ found Beck was capable of performing work as a dispatcher as generally performed in the national economy. Based on the VE's testimony, work as a dispatcher as generally performed meets Beck's RFC restrictions of occasionally lifting or carrying 10 pounds, and frequently lifting or carrying less than 10 pounds. (AR 76-77). This is also consistent with the Functional Capacity Evaluation, which recommended Beck could occasionally lift 13 pounds, frequently lift 6 pounds, and constantly lift 3 pounds. (AR 718).

Accordingly, the Court finds that even if Beck lifted up to 50 pounds when she previously worked as a dispatcher, substantial evidence supports the ALJ's conclusion that Beck could perform her past relevant work as a dispatcher as generally performed in the national economy. *See Aukland*, 257 F.3d at 1035.

**V.    Remedy**

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690. Here, the record contains sufficient substantial evidence to meet this standard.   The Court concludes the ALJ's findings are supported by substantial evidence and there is no legal basis for reversing or remanding her decision. Therefore, Beck is not

1   entitled to relief.

2       VI.     **Recommendation**

3       For the foregoing reasons, the Magistrate Judge recommends the District Court,

4   after its independent review, enter an order denying Plaintiff's request to reverse the

5   Commissioner's final decision.

6       Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections

7   within fourteen days after being served with a copy of this Report and Recommendation.

8   A party may respond to another party's objections within fourteen days after being served

9   with a copy thereof. Fed. R. Civ. P. 72(b). No reply to any response shall be filed. *See id*.

10  If objections are not timely filed, then the parties' rights to de novo review by the District

11  Court may be deemed waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121

12  (9th Cir. 2003) (en banc).

13      Dated this 18th day of August, 2014.

14

15

16

17  Eric J. Markovich
    United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28